IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34718-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEGHAN LILLIAN MIANECKI, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — The State charged Meghan Mianecki with rape of a child in the

second degree and molestation of a child in the second degree. The State filed the

charges in adult court nine months after the alleged victim and his family reported the

allegations to law enforcement. Mianecki was seventeen years of age when she

purportedly committed the crime. She turned eighteen years of age before the State filed

charges. The trial court denied Mianecki's motion to dismiss the charges on the basis of

preaccusatorial delay. We affirm.

## FACTS

Since this appeal comes to us without a trial, we extract the facts from police

reports and testimony presented during a hearing conducted to resolve Meghan

Mianecki's motion to dismiss the prosecution on the basis of preaccusatorial delay. We note that Mianecki has not yet had the opportunity to refute the factual allegations of the State.

According to Andrew Bartholomew, Meghan Mianecki, on July 23, 2015, sexually assaulted him. Andrew Bartholomew is a pseudonym. The two were then classmates and cross-country teammates. Bartholomew was a twelve-year-old boy and Mianecki was a seventeen-year-old girl. We do not know the circumstances under which a twelve and seventeen-year-old attended the same school or participated on the same cross-country team.

According to Andrew Bartholomew, on July 23, Meghan Mianecki phoned the Ascencio home, where Andrew resided, and requested to visit. The record does not reflect to whom Mianecki spoke at the Ascencio home. Mianecki previously dated Andrew's older brother. Mianecki arrived thereafter at the Ascencio residence. No adults were home. Mianecki sat on the couch next to Andrew, kissed his neck, and eventually guided him to his bedroom where the two engaged in sexual intercourse. Mianecki gave Andrew hickeys on his neck and left shoulder. When Andrew's mother, Lilia Ascencio, drove Andrew to track practice later that afternoon, she noticed marks on her son's neck. Andrew reluctantly told his mother about the incident with Mianecki.

On July 23, 2015, Lilia Ascencio reported a sexual assault to the Grant County Sheriff's Office. The Sheriff's Office assigned sheriff deputies Nick Overland and Jacob

2

Fisher to the case. Deputy Fisher served as Deputy Overland's field training officer. Overland had never investigated a sex crime.

On July 23, Deputies Nick Overland and Jacob Fisher met Lilia Ascencio, her son Andrew Bartholomew, and Bartholomew's father, at the Grant County Sheriff's Office. Ascencio told the deputies that Andrew's classmate and cross-country teammate, Meghan Mianecki, sexually assaulted him earlier that day. The deputies then conducted an initial interview of the family. Andrew repeated the story above.

At the close of the interview, Grant County Sheriff Deputy Nick Overland photographed the hickeys on Andrew's neck. Overland also collected the clothes Andrew wore that day and the condom allegedly used when Meghan Mianecki and Andrew engaged in sex. After photographing and collecting the evidence, Andrew informed the deputies he would be more comfortable preparing a written statement at his residence. Accordingly, the deputies followed Ascencio and Andrew to the mother and son's residence to collect Andrew's statement.

On arrival at Lilia Ascencio's home, Deputies Nick Overland and Jacob Fisher sequestered the pair of shorts and underwear Andrew wore after the sexual encounter. Deputy Fisher then prepared Andrew's written statement. In his statement, Andrew said that "[he] did not want to have sex, but [he] did not know what to do." Clerk's Papers (CP) at 9. Andrew also disclosed that Meghan Mianecki told him not to tell anyone of

3

the event. At the completion of the statement, Ascencio advised the deputies that she intended to obtain a protection order to keep Mianecki away from Andrew.

Deputy Nick Overland testified, during Meghan Mianecki's motion to dismiss hearing, about the course of the investigation after July 23, 2015. Overland did not deem his investigation complete after interviewing Andrew, photographing his neck, and collecting the young man's clothes. If he had then forwarded the evidence collected to the prosecutor, the prosecutor would have returned the evidence with a request for deoxyribonucleic acid (DNA) testing on the clothes and also requested the completion of other tasks.

On August 6, 2015, Grant County Sheriff Deputies Nick Overland and Jacob Fisher attempted to interview Meghan Mianecki at her home regarding the alleged sexual assault. Connie Mianecki, Meghan's mother, answered the residence's door. The mother told the deputies that her daughter was not home and that the family had obtained a lawyer, who advised Meghan not to speak with officers. The deputies informed Connie that they planned to request a search warrant for her daughter's DNA. The officers wanted Mianecki's DNA to compare to DNA evidence found on Andrew Bartholomew's clothing and the condom.

Sheriff Deputies Nick Overland and Jacob Fisher obtained a warrant authorizing the collection of Meghan Mianecki's DNA through a buccal swab. The deputies went to the Mianecki residence on August 14, 2015 and met with Connie and Meghan Mianecki

4

to execute the warrant. Overland took two buccal swabs from Meghan. Fisher photographed the process.

Deputies Nick Overland and Jacob Fisher did not place Meghan Mianecki under arrest on August 14. Deputy Overland testified, at the motion hearing, that the deputies lacked evidence to support or refute Andrew Bartholomew's story. According to Overland: "it was a he-said/she-said" case. Report of Proceedings (RP) at 13. When the deputies first contacted the Mianeckis, they hoped that Mianecki would disclose her side of the story. The deputies did not arrest Mianecki because they did not judge her a threat to society or to Andrew and because Mianecki posed no risk to flee. Law enforcement supplied Andrew's family with multiple resources to protect Andrew inside and outside of school.

On August 18, 2015, Deputy Nick Overland forwarded the buccal swabs, Andrew Bartholomew's clothing, and the condom to the Washington State Patrol Crime Laboratory. On the laboratory request form, Deputy Overland did not check the box to indicate a desire for the laboratory to "rush" its analysis of the evidence. The request form indicated that the suspect was not in custody, but did not indicate whether the officers had referred the case to the prosecutor's office or whether a court date was pending.

Alison Walker, a scientist in the Washington State Patrol Crime Laboratory DNA Section, also testified during the motion to dismiss hearing. She eventually analyzed the

5

DNA evidence found on the buccal swabs and Andrew Bartholomew's clothing. During the motion hearing, Walker explained the procedure the laboratory follows on receipt of a request for a DNA analysis. A supervisor "triages" and assigns the laboratory's cases to the scientists. RP at 57. Triaging lasts four to six weeks. Walker did not describe the triage process. Walker testified the laboratory received Deputy Nick Overland's request to analyze the DNA on August 19, 2015, and her supervisor assigned her the case on October 9, 2015. According to Walker, the seven-week passage did not exceed the laboratory's standard time frame.

According to Alison Walker, a DNA analysis takes four to six weeks to complete after the assignment to the scientist. This window of time includes a scientific peer review of the analyst's report. Walker completed her report regarding Meghan Mianecki's DNA on November 25, 2015, forty-seven days after the assignment.

Alison Walker admitted, during the motion hearing testimony, that the Washington State Patrol Crime Laboratory designates priority treatment to some cases. The laboratory may allocate priority status to a homicide or a sexual assault case with an unknown perpetrator or to a pending case with a hearing date shorter than six weeks. The agency requesting the report dictates whether circumstances exist to prioritize the case. If the Grant County Sheriff's Office had marked "rush" on Meghan Mianecki's DNA request but the office had not identified a pending court date, the laboratory would have assigned the case to a scientist as quickly as possible. Walker did not concretely cast

6

what number of days constitutes "as quickly as possible." RP at 67. Walker could not recall any case, involving a minor suspect, given priority.

On December 2, 2015, the Grant County Sheriff's Office received the DNA test results from the Washington State Patrol Crime Laboratory. We do not know the results. Deputy Nick Overland did not work on December 2 or 3, 2015. During the motion hearing, Deputy Overland averred that he could not recall when he received the laboratory report. He testified to a busy schedule between December 2 and 23 with his working eleven shifts and responding to forty-four calls. Overland also commented that the Grant County Sheriff's Office handled multiple other investigations in neighboring Adams County during late 2015. Overland presumed he received the laboratory report on December 23, 2015, because that date appears at the top of his supplemental officer's report. On cross-examination, Overland conceded that he could not answer why neither Deputy Jacob Fisher nor he reviewed the report before December 23, 2015.

Meghan Mianecki turned eighteen on December 19, 2015. Deputy Nick Overland testified that he knew of Mianecki's age, but did not monitor her birthday. Deputy Overland maintained that Mianecki's age did not concern him during the investigation and that the Grant County Sheriff's Office handles every case in the same manner regardless of the suspect's age. Overland averred that nothing unusual transpired regarding the pace of the investigation of allegations against Meghan Mianecki.

On January 5, 2016, Sheriff Deputy Nick Overland referred the Meghan Mianecki

7

case to the Grant County Prosecuting Attorney's Office. The Grant County office

referred the case to the Adams County Prosecuting Attorney's Office because of a

conflict.

## PROCEDURE

On April 1, 2016, the State of Washington charged Meghan Mianecki with rape of

a child in the second degree and child molestation in the second degree. Mianecki filed a

motion to dismiss for preaccusatorial delay. At the motion hearing, Deputy Nick

Overland and Washington State Patrol Crime Lab scientist Alison Walker testified for the

State. The following colloquy occurred between defense counsel and Deputy Overland

during the hearing:

> Q. And neither one of you had any time during those—let's see. It
> would have been 17 days until Meghan's birthday on the 19th—to review
> that report and submit a report to the prosecutor?
> A. I don't have an answer for that, sir.

RP at 45.

The trial court denied Meghan Mianecki's motion to dismiss. We accepted

discretionary review of the trial court's order.

## LAW AND ANALYSIS

### Due Process

On appeal, Meghan Mianecki repeats her request for dismissal of the pending

charges because preaccusatorial delay denied her due process. She contends the State's

8

reason for delay does not outweigh the severe prejudice caused by being tried as an adult. While the State concedes prejudice by the loss of juvenile court jurisdiction, it disagrees that prejudice outweighs the reasonable basis for the delay. We review de novo the question of whether preaccusatorial delay violates an accused's due process rights. *State v. Oppelt*, 172 Wn.2d 285, 290, 257 P.3d 653 (2011). We agree with the State primarily on the ground that the law does not require the State to hurry an investigation when the suspect may soon turn age eighteen.

Washington employs a three-tined test when determining if preaccusatorial delay violates due process: (1) the accused must show actual prejudice from the delay, (2) if the accused shows prejudice, the court must determine the reasons for the delay, and (3) the court must then weigh the reasons for the delay and the prejudice to determine whether prosecution would breach fundamental conceptions of justice. *State v. Oppelt*, 172 Wn.2d at 295. In clarifying the elements of the tripartite test, our Supreme Court advised that this test is "best understood as an analytical tool to assist" courts in conducting a preaccusatorial delay analysis. *State v. Oppelt*, 172 Wn.2d at 295. The central inquiry always remains whether the action by the government violates fundamental conceptions of justice. *State v. Oppelt*, 172 Wn.2d at 292 (2011).

Although not stated in the three-part test, a predicate to a preaccusatorial delay analysis should be a finding that a delay in filing charges occurred. All three elements assume the presence of a delay. Nevertheless, none of the Washington reported decisions

9

discuss whether or not a delay occurred. The decisions assume some delay and then directly analyze prejudice caused by the delay and the reasons for the delay. The court reviews the length of the time between law enforcement's learning of the crime and the filing of charges when evaluating the reasons for the delay. Nevertheless, no decision asks whether a court must conduct the three-prong preaccusatorial delay analysis when no delay occurred.

We suggest that the State should enjoy a reasonable time during which to investigate and review possible charges without being blamed with any delay. Otherwise, the law would demand that the court engage in the three-pronged preaccusatorial delay assessment even if the State filed charges two days after law enforcement learned of the crime. The public and the accused deserve a scrupulous, not rushed, investigation by law enforcement and thorough review of possible charges by the prosecuting attorney before the filing of charges. Because of varying circumstances concerning the nature of the alleged crime, the scope of the investigation needed before filing charges, and other work commitments of law enforcement, we assume that the law cannot afford any firm deadline with regard to when a delay commences to run.

Although we conclude that no delay occurred in the investigation of Andrew Bartholomew's allegations, we engage in Washington's orthodox three-elements test. The accused must first show the State's purported lagging caused actual prejudice to her defense in order to satisfy prong one of the prosecutorial delay test. *State v. Salavea*, 151

10

Wn.2d 133, 139, 86 P.3d 125 (2004); *State v. Norby*, 122 Wn.2d 258, 264, 858 P.2d 210 (1993). Under due process rules, courts presume prejudice on loss of juvenile court jurisdiction. *State v. Dixon*, 114 Wn.2d 857, 861, 792 P.2d 137 (1990). Offenders fulfill their burden of proof when prosecutorial delay causes a loss of juvenile court jurisdiction because the loss results in a decrease of benefits available to a defendant in the juvenile court system. *State v. Salavea*, 151 Wn.2d at 139; *State v. Dixon*, 114 Wn.2d at 860-61; *State v. Alvin*, 109 Wn.2d 602, 604, 746 P.2d 807 (1987); *State v. Calderon*, 102 Wn.2d 348, 352-53, 684 P.2d 1293 (1984). The loss of juvenile court jurisdiction subjects the accused to harsher penalties and the potential stigma of an adult criminal conviction. *State v. Dixon*, 114 Wn.2d at 860-61. Thus, we conclude that Meghan Mianecki shows prejudice.

We turn to the State's side of the equation. We must first measure the delay to analyze the reasons for and nature of the delay. When an accused argues prejudicial delay because of loss of juvenile court jurisdiction, the critical time period of delay ends with the defendant's eighteenth birthday. *State v. Brandt*, 99 Wn. App. 184, 190, 992 P.2d 1034, 9 P.3d 872 (2000). Any delay after the birthday does not prejudice the defendant because the juvenile court generally loses jurisdiction on the defendant's eighteenth birthday. *State v. Acheson*, 75 Wn. App. 151, 155, 877 P.2d 217 (1994); *State v. Bushnell*, 38 Wn. App. 809, 811, 690 P.2d 601 (1984). Thus, the ending date for our window of delay is December 19, 2015, Meghan Mianecki's eighteenth birthday.

11

Under the second step in the due process analysis, we identify, characterize, and ascertain a level of blame for the State's conduct that led to the delay. An important question is whether the delay in prosecuting an accused was justified. *State v. Brandt*, 99 Wn. App. at 189 (2000). The State holds broad discretion to decide when to prosecute and may delay prosecution until it determines it can establish guilt beyond a reasonable doubt. *State v. Salavea*, 151 Wn.2d at 146 (2004). Absent a showing of arbitrary action or governmental misconduct, a trial court cannot dismiss charges. *State v. Michielli*, 132 Wn.2d 229, 240, 937 P.2d 587 (1997). The due process clause protects against arbitrary action or governmental misconduct and does not grant courts the authority to substitute their judgment for that of the prosecutor. *State v. Cantrell*, 111 Wn.2d 385, 390, 758 P.2d 1 (1988); *State v. Starrish*, 86 Wn.2d 200, 205, 544 P.2d 1 (1975).

Loss of juvenile court jurisdiction does not automatically lead to a finding of unjust prosecutorial delay, in part, because loss of jurisdiction is not always the fault of the State. The accused has no constitutional right to be tried as a juvenile. *State v. Dixon*, 114 Wn.2d at 860 (1990). Absent extraordinary circumstances, the State may manage a juvenile's case in the same manner as all other cases and need not afford special treatment to the case even if the juvenile soon turns eighteen. *State v. Salavea*, 151 Wn.2d at 146 (2004); *State v. Calderon*, 102 Wn.2d at 354 (1984). The preceding rule controls this appeal.

We agree with the trial court that the five months that elapsed from the beginning

12

of the law enforcement investigation to Meghan Mianecki's turning the age of majority do not entail government misconduct or mismanagement of the case. The State instead handled the case in its ordinary course without any delay. Thus, based on Supreme Court precedence, we need not balance and weigh the prejudice to Mianecki and the State's reason for any delay.

Meghan Mianecki focuses on the DNA report arriving in the Grant County Sheriff's Office on December 2, but no officer reviewing the report until December 23. She turned eighteen on December 19. Yet, no evidence supports a finding that the passing of twenty-one days is unreasonable when law enforcement remains busy with other work commitments. Mianecki provides no argument as to when the report should have been reviewed. Mianecki also highlights the trainee status of Deputy Nick Overland. Nevertheless, no evidence suggests that the investigation would have proceeded faster if a veteran deputy oversaw the investigation. Often rookies work faster than veterans.

Meghan Mianecki underscores Sheriff Deputy Nick Overland's inability to answer why either he or Deputy Jacob Fisher failed to review the DNA report between December 2 and December 19. This emphasis ignores the overwhelming testimony of Nick Overland and Crime Lab scientist Alison Walker. The State followed standard procedures and fulfilled general expectations for completing tasks such as gathering DNA evidence, shipping the evidence to the crime lab, assigning a technician to analyze

13

the evidence, preparing the technician report, sending the report to law enforcement, reviewing the report, and forwarding the law enforcement file to the prosecutor. Deputy Overland testified to a busy work schedule in December 2015. In turn, he only conceded that he could not, like most everyone else, account for the details of all of his work during each day.

We further note that, even if the Grant County's Sheriff's Office reviewed the report within a week, the sheriff's office needed to assemble the report and other information and forward the information to the prosecuting attorney's office. Mianecki does not contend that the prosecuting attorney, in the normal course of business, would have filed charges by December 19 even assuming law enforcement reviewed the report on December 3.

Meghan Mianecki emphasizes that her age formed the basis of her crime. Therefore, the State readily knew of her age during the investigation of the crime, and law enforcement should have ensured that the investigation ended and any charges were filed before she turned age eighteen. We reject this emphasis as relevant to our analysis. No case addressing preaccusatorial delay grounds its holding on the nature of the crime. In most, if not all, cases involving allegations of preaccusatorial delay, law enforcement knew of the age of the suspect. Still, law enforcement holds no obligation to speed the process in order to file charges before the accused legally gains adulthood.

Meghan Mianecki perspicaciously relies on *State v. Frazier*, 82 Wn. App. 576,

14

918 P.2d 964 (1996) *abrogated by State v. Oppelt*, 172 Wn.2d 285, 257 P.3d 653 (2011), in which this court affirmed the dismissal of charges against Jason Frazier. Nevertheless, the trial court found negligence and the record supported the finding of negligence of the State in its investigation. On June 10, 1992, Frazier confessed to law enforcement to being involved in three burglaries. The State did not file charges until November 19, 1993, seventeen months later. We do not know when Frazier turned eighteen. The State failed to account for an eight-week delay between the investigating officer's completion of his report and the receipt of the report by the juvenile court or the eight-week delay between the prosecutor's receipt of the report and Frazier's eighteenth birthday. These facts do not echo the facts in our appeal.

## Equal Protection

Meghan Mianecki argues that allowing the State to prosecute her as an adult for an alleged juvenile act based on her age without a reasonable basis for its preaccusatorial delay violates her right to equal protection under the Fourteenth Amendment to the United States Constitution. She contends the State treated her differently from other juveniles. Of course, Mianecki's argument assumes that the State delayed the investigation and lacked a legitimate reason for the delay. We disagree with these assumptions.

In her appeal brief, Meghan Mianecki cites to case law that discusses the levels of scrutiny that the court applies to government conduct and the importance of juvenile

15

court jurisdiction. Nevertheless, Mianecki cites no authority that entails the passage of time before the State files criminal charges. Naked castings into the constitutional seas are not sufficient to command judicial consideration and discussion. *State v. Johnson*, 179 Wn.2d 534, 558, 315 P.3d 1090 (2014); *State v. Blilie*, 132 Wn.2d 484, 493 n.2, 939 P.2d 691 (1997).

## CONCLUSION

We affirm the trial court's denial of Meghan Mianecki's motion to dismiss her prosecution. We remand for further proceedings.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, J.

16